UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA

VERSUS

9.345 ACRES OF LAND, MORE OR
LESS, SITUATED IN IBERVILLE
PARISH, STATE OF LOUISIANA, AND
SIDNEY VINCENT ARBOUR, III, ET AL

CIVIL ACTION

NO. 11-803-JJB-EWD

### RULING

This matter is before the Court on Defendants' Rule 71.1(h) Motion to Exclude Certain Prejudicial Post Date of Taking Evidence (Doc. 366) brought by the Defendants. The Plaintiff, the Government, filed an Opposition (Doc. 378), and the Defendants filed a Reply (Doc. 383). Oral argument is unnecessary. The Court's jurisdiction exists pursuant to 28 U.S.C. § 1358. For the reasons stated herein, the Defendants' Motion is **GRANTED**.

## I.    BACKGROUND

On November 30, 2011 ("the date of the taking" or "the taking date"), the United States acquired Cavern 102 of the Bayou Choctaw Salt Dome ("Salt Dome"), in Iberville Parish, for the Strategic Petroleum Reserve ("SPR"). The SPR maintains crude oil reserves for national emergencies and security.

The United States acquired Cavern 102 to mitigate the loss of Salt Dome Cavern 20, which the Department of Energy had determined presented a risk of environmental harm if it remained in operation. On the date of the taking, Cavern 102 was owned by numerous individuals and leased to others (collectively, "Defendants"). The Department of Energy owns several of the caverns in the Salt Dome while the Defendants own and operate other caverns.

1

This case is set to have a jury trial in late 2017. The sole issue for the jury to determine is the just compensation that must be paid to the Defendants for the condemnation of Cavern 102. The jury must award the Defendants the value of the property as of the date of the taking.[1] The value of the property can be determined by its market value—that is, what a willing buyer would have paid to a willing seller for the land as of the taking date.[2] "Just compensation is not limited to the value of the property as it is presently used, but includes any additional market value it may command because of prospects for developing it to the highest and best use for which it is suitable."[3] Even when considering a non-existent, future highest and best use, a proper market valuation only considers what the reasonable buyer and seller would have considered on the date of the taking.[4]

In this case, both of Defendants' valuation experts have asserted that the highest and best use for Cavern 102 is for natural gas storage even though Cavern 102 has never been used for natural gas storage.[5] Prior to the taking, Cavern 102 stored liquid ethane.[6] Now owned by the United States, Cavern 102 currently stores crude oil as part of the SPR.[7]

Due to the fact that Defendants' experts, Boggs and Truax, seek to value Cavern 102 based on the hypothetical use as a natural gas storage area, evidence about the natural gas storage market is relevant to determining what a willing buyer would have paid a willing seller for Cavern 102 on the date of the taking for use of that cavern as a natural gas storage facility.

During the course of discovery, the Defendants learned that the Government intends to rely on information about the natural gas storage market and the business decisions of the Defendants

---

[1] *United States v. 320.0 Acres of Land*, 605 F.2d 762, 781 (5th Cir. 1979).
[2] *Id.*
[3] *Id.* (internal quotation marks omitted).
[4] *United States v. Toronto, Hamilton & Buffalo Navigation Co.*, 338 U.S. 396, 406 (1949).
[5] Defs.' Memo 5, Doc. 366.
[6] Pl.'s Opp. 4, Doc. 378.
[7] Pl.'s Brine Motion 3, Doc. 353-1.

that occurred after the date of the taking.[8] The Defendants now move to exclude all of this post-taking evidence, arguing that what actually happened in the natural gas storage market and in the Defendants' business in the years after the date of the taking up to the time of trial, cannot and should not have any bearing on a proper market valuation in this case because they are not facts that a willing buyer and willing seller would have been able to know and consider on the date of the taking. The Government opposes this argument. Although the Government agrees that the property must be valued as of the date of the taking, it argues that this post-taking evidence is admissible to confirm one of their expert's primary arguments—that the market for natural gas storage fundamentally and negatively had changed prior to the date of the taking, and market participants expected this decline to continue for the long-term. In effect, the Government argues that it should be able to cross examine Defendants' experts about what actually occurred to show how those experts' forecasts about the natural gas storage market were unreasonable and highly speculative.

## II.   STANDARD

In eminent domain cases, a district court has a broader gatekeeping function than it does in other civil cases. Federal Rule of Civil Procedure 71.1 governs "proceedings to condemn real and personal property by eminent domain." In a federal condemnation case tried to a jury, a court must decide "all issues" other than the amount of compensation to be awarded.[9] This Rule "discloses a clear intent to give the district judge a role in condemnation proceedings much broader than he occupies in a conventional jury trial."[10]

---

[8] There are currently two pending Motions to Compel brought by the Government to have Defendants produce documents about their natural gas storage business in 2012. *See* Docs. 364 & 365.

[9] *United States v. Reynolds*, 397 U.S. 14, 19-20 (1970).

[10] *Id.*

3

### III.    LAW & ANALYSIS

This Motion asks the Court to answer the following question—is the fact that the natural gas storage market sharply declined after the date of the taking admissible to show that it was reasonable to believe beforehand that such a downturn was likely? Stated another way, should the Government be allowed to introduce evidence about a failing natural gas storage market after 2011 in order to corroborate their experts' opinions that prior to the date of the taking, November 30, 2011, market participants expected this decline to occur?

For the reasons that follow, the Court finds that this evidence is relevant. The post-taking evidence has a tendency to make the Government's factual assertions—that market participants understood that there was a steep decline at the date of the taking in the gas storage market and that this decline would not reverse—more probable than they would be without this evidence. However, although relevant, the Court finds that this post-taking evidence is substantially more prejudicial than probative and therefore shall be excluded.

### A.    Ruling on this Motion is Not Premature.

As a preliminary matter, this Court first determines whether ruling on this Motion would be premature. In their Opposition, the Government argues that the Defendants have failed to provide the Court with any of the documents or deposition testimony they seek to exclude. The Government asserts that courts should not issue advisory Rule 403 opinions months before trial and before all of the evidence is known.

The Motion is ripe for decision for two reasons. First, the Court has sufficient, specific examples of post-taking evidence to determine whether post-taking evidence should be excluded generally. Second, it is proper to determine this issue now as the Court has a broad gatekeeping function in condemnation cases.

While the Government asserts that it does not have post-taking evidence from the Defendants after the date of the taking because Defendants refuse to produce this evidence, the Government provides the Court with publicly available information that it intends to rely on about events that occurred after the date of the taking. For example, the Government intends to rely on information that in 2014 the Defendants requested a minimum bid of $.02 for storage space in natural gas storage caverns at the Bayou Choctaw Salt Dome to rebut the Defendants' assertions that they could have filled Cavern 102 at $.171.[11] Another example of evidence that the Government intends to rely on is a Federal Energy Regulatory Commission filing from 2014 in which the Defendants told FERC they wanted to close one of their caverns because "[t]he capacity and deliverability associated with [this cavern] is no longer needed by the natural gas storage market [and] [d]emand for Gulf Coast natural gas storage capacity is not anticipated to change over the next several years."[12]

Second, cognizant of its broad gatekeeping role in a condemnation proceeding tried to a jury, the Court agrees with the Defendants and finds that this Motion is ripe for decision and will help focus the issues for a jury.[13] Despite the Government's arguments, this Court does not need to take a document by document analysis to determine whether the post-taking evidence is admissible. In fact, the available information supplied to the Court allows the Court to undertake the necessary analysis to determine whether it should exclude all post-taking evidence related to the gas storage market decline.

---

[11] Pl.'s Opp. 8, Doc. 378.
[12] *Id.*
[13] Defs.' Reply 4 n. 7, Doc. 383.

## B.     The Post-Taking Evidence is Relevant.

First, Defendants argue that exclusion of all post-taking evidence is appropriate because information concerning events that occurred after the condemnation could not have possibly influenced the conduct of a willing buyer and seller on the date of the taking, and thus, such post-taking events can never be logically nor legally relevant in determining the price that a willing buyer and seller would have agreed upon on the date of the taking. The Government opposes this argument, asserting that the Defendants' interpretation of legal relevance is much too narrow. The Government points to Federal Rule of Evidence 401 which states that evidence is "relevant" if it "has any tendency to make a fact more or less probable than it would be without the evidence." The Government states that the post-taking evidence about a depressed natural gas storage market is relevant because it "has a tendency to make the United States' facts—including that market participants understood that there was a steep market decline at the date of the taking and that this decline would not reverse in the reasonably near future—more probable than they would be without the evidence."[14]

The Court finds the case *Mich. Dept. of Transp. v. Haggerty Corridor Partners Ltd. P'ship*, a case discussed by both parties, instructive on the issue of whether the post-taking evidence is relevant to a determination of just compensation.[15] In that case, the question before the Michigan Supreme Court was whether "evidence of rezoning after a taking is admissible to demonstrate that, when the taking occurred, a *reasonable possibility* of rezoning existed."[16]

Of the seven Justices on the Michigan Court, four Justices determined that evidence of the post-taking rezoning should have been excluded. Three of those Justices based their holding on

---

[14] Pl.'s Opp. 10, Doc. 378 (internal quotation marks omitted).
[15] 700 N.W.2d 380 (Mich. 2005)
[16] *Id.* at 394 (emphasis added).

the fact that such post-taking evidence was not relevant, while one of the Justices who voted to exclude the evidence, based her holding on a finding that the evidence was relevant but its probative value was substantially outweighed by its prejudicial effect. The other three found that the evidence was relevant and should have been admitted.

For purposes of this Motion, the Court finds the dueling opinions of Justice Young and Justice Kelly helpful. In the lead opinion, Justice Young explained why post-taking evidence was irrelevant in determining just compensation:

> Consequently, because information concerning events occurring *after* the condemnation could not possibly have influenced the conduct of a willing buyer on the date of the taking, it can never be logically, and thus legally, relevant in determining the price that the theoretical willing buyer and seller would have agreed upon on the date of the taking.

> Consider the application of this theory of probability to an event—such as the toss of a die—the probability of which is known. That a six is rolled *after* one predicts this outcome does not increase the strength of the prediction beyond the usual one-in-six chance of being correct. However, contrary to conventional probability theory, the proffered dissenting probability theory suggests that the predictive force of a "six" call is made stronger by the mere fact that the thrown die actually revealed a six. It is hard to understand how such a "back to the future probability theory" works any more logically when an event less predictable than the roll of a die is at issue.

> While a posttaking change in zoning may suggest that one party may have had a more astute prognostication of local zoning practices, it cannot seriously be advanced that a zoning change made after the taking could in any way have influenced a "willing buyer's" pricing decision on the day of the taking. Only that which could legitimately influence a buyer at the time of the taking is legally and logically relevant to the amount of compensation that must be paid for a taking. Because events that occur after the taking fall outside this zone of potential influence, they cannot logically and therefore legitimately be considered in determining just compensation."[17]

Justice Kelly, while agreeing that such evidence was inadmissible because of its prejudicial effect, disagreed with Justice Young and found that the post-taking information was relevant:

---

[17] *Id.* at 390.

Justice Young's example of the roll of a die is misplaced. When one is asked beforehand the result of the roll of a die, six is among the guaranteed results. Each of the six alternative results has an equal chance of occurring with every roll. The fact that a six was rolled is unnecessary to prove that six was possible or that it was reasonable to believe before the roll that six was possible.

Rezoning is more like a horse race than the roll of a die. The probability of a certain horse winning depends on many factors. They include, among others, the condition of the horse on race day, the condition of the other horses, and the condition of the track. The odds on a bet placed on that horse, which are an expression of the perceived probability of that horse winning, are based on these factors known before the race. If the horse wins, the victory corroborates the strength of the prediction that the horse would win. But there are no guarantees that the horse will ever win, unlike the result of the roll of a die.

Similarly, there are no guaranteed outcomes when one estimates whether property will be rezoned. Rezoning is one of several possibilities. The probability of it occurring may never become a reality. But the fact of rezoning corroborates the assertion that the belief it would be rezoned was reasonable, just as a winning bet corroborates the belief that a horse would win. As Justice Young notes, rezoning suggests that the prognostication is more accurate than another's that was to the contrary. Hence, the evidence of rezoning is legally relevant.[18]

This Court agrees with Justice Kelly.[19] Here, the issue is whether evidence of a declining natural gas storage market after 2011 somehow corroborates the assertion that a market participant would not believe the natural gas storage would do well after the taking. The Court finds that market performance is like Justice Kelly's hypothetical horse race. While a market may perform well to a certain extent or it may perform poorly, there is no guaranteed outcome that it will perform one way or the other. However, the fact that a market declines serves as corroboration that such a belief was reasonable, just as a winning bet in a horse race corroborates the belief that a horse would win. The fact that the natural gas storage market performed poorly after 2011 suggests that the Government's experts' predictions that it would decline, were more reasonable predictions

---

[18] *Id.* at 397.
[19] Additionally, the Government argues that the Defendants have conceded the relevance of post-taking information, but the Court does not address this argument because it finds that the evidence is relevant.

than the Defendants' experts who suggested that such a market would do well. Accordingly, evidence about the natural gas storage market after 2011 is legally relevant. However, for the reasons explained below, this evidence is substantially more prejudicial than probative and will likely confuse the jurors.

### C.    The Post-Taking Evidence is Substantially More Prejudicial Than Probative; The Government Has Other Probative Evidence to Make Its Case.

Under Rule 403, a court may exclude relevant evidence if its "probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury…" For the reasons that follow, the Court excludes the post-taking evidence because the jury will likely disproportionately rely on it to determine value, and this problem cannot be cured by a jury instruction. Furthermore, excluding this evidence will not unfairly hinder the Government in presenting its case because it can rely on information pre-taking to demonstrate the supposed poor state of the natural gas storage market.

There is no case directly on point or one that would definitively direct what the Court should do here. However, once again, the Court finds the Michigan Case, *Haggerty*, helpful in determining whether to exclude post-taking evidence here because it explores the issue of whether a jury can properly limit consideration of post-taking evidence.

In that case, the jury had to determine the just compensation owed by the government to the defendants for a piece of property taken from the defendants and turned into a highway. At the time of the taking, the land was zoned for residential use.[20] Consistent with its theory that the highest and best use of the land was for residential uses, the government presented evidence that

---

[20] *Haggerty*, 700 N.W.2d at 382.

the land was not likely to be rezoned for commercial purposes.[21] Defendants, on the other hand, sought to establish that they, along with market participants, knew that as of the date of the taking the land was likely to be rezoned as commercial.[22] Consistent with their theory that the fair market value of the residential property on the date of the taking was increased because of the realistic prospect that it would soon be rezoned commercial, defendants sought to introduce evidence of the fact that the property had, in fact, been rezoned a few years after the taking.[23]

Although Justice Kelly found this evidence to be legally relevant, she held that it should have been excluded because of its tendency to confuse:

> The mischief here is that, once a juror hears evidence that rezoning occurred, the juror will have difficulty concluding anything but that rezoning was reasonably possible when the taking occurred…The fact that rezoning did occur does not mean that it was reasonably possible at the time of or before the taking that it would occur. At first blush, posttaking rezoning is compelling evidence that there was a strong possibility of rezoning at the time of the taking. But the admission of this evidence was unfair because of the significant danger that the jury would not properly limit its consideration of it. Admission of this evidence risks that the jury will accord it weight wildly disproportionate to its probative value and treat rezoning when the taking occurred as a foregone conclusion.[24]

Justice Kelly correctly describes the "mischief" of such post-taking information. Admission of the fact that rezoning occurred would create a substantial risk that the jury would stray from their proper role—to value the property at a time when it was only reasonably possible that it would be rezoned, and not to value it once it was rezoned. Here, admission of evidence that the natural gas storage market declined and that the Tenant Defendants did not want to use their caverns for natural gas storage, tends to lead to the same problems addressed in *Haggerty*. Admission of the post-taking market collapse risks that a jury will treat the market collapse when

---

[21] *Id.*
[22] *Id.* at 383.
[23] *Id.*
[24] *Id*. at 398.

the taking occurred as an inevitable conclusion, rather than valuing the property at a time when the state of the energy market and energy storage market was unknown.

The Government cites various cases, both condemnation and other cases[25], in which courts have found evidence of post-taking events admissible to determine value. None of these cases are binding on the Court and none lay out a strict rule that post-taking information will *always* be admissible. Moreover, the various cases cited by the Government in which post-taking information was allowed are all distinguishable from the present case.

The Government places strong reliance on two Court of Claims cases from 1980[26] and a Second Circuit case from 1948.[27] These cases are distinguishable for two main reasons. First, they all involved bench trials; therefore, none of the decisions addressed the unique Rule 403 issues that arise when evidence is being presented to a jury. While a court may be able to properly limit its consideration of post-taking data and confine such data to its proper use (although this may be a difficult task even for courts and commissioners), a jury is likely to disproportionately rely on the post-taking evidence and treat the market collapse as inevitable as of the taking date rather than just a reasonable possibility. Once the jury hears what actually happened, it will be virtually impossible for the jury to focus on the proper inquiry which is to determine the value of the property on the taking date, considering the highest and best use on that date. The Court finds that a jury instruction cannot cure the confusion that will necessarily result from introduction of this evidence. These three decisions, unlike the *Haggerty* decision, do not discuss the difficulties that

---

[25] The Court finds that the patent cases relied on by the Government are unhelpful in resolving the issue before the Court as patent law is an area that raises unique issues not present in condemnation cases.

[26] *Georgia-Pacific Corp. v. United States*, 640 F.2d 328 (Ct. Cl. 1980); *Miller v. United States*, 620 F.2d 812 (Ct. Cl. 1980).

[27] *United States v. Brooklyn Union Gas Co.*, 168 F.2d 391 (2d Cir. 1948).

would arise were the jury to hear the post-taking information and so they are unhelpful in coming to a conclusion regarding the present dispute.

Second, these decisions all involved severance damages which requires an inquiry that is distinct from the inquiry that the jurors in this case are faced with, an inquiry into the value of the part taken. Using post-taking information to determine severance damages does not cause the same confusion that using post-taking information to determine the value of the part taken causes. Severance damages arise in cases where the Government takes less than the owner's entire property interest. In partial taking cases, "the compensation to be awarded includes not only the market value of the part of the tract appropriated, but the damage to the remainder resulting from the taking…"[28]

The severance damage inquiry is forward-looking, in that, in order to give just compensation to the landowner, the fact finder must determine how a unique piece of property is damaged by a taking. The "value of the part taken" inquiry is present-looking, in that, the fact finder must put himself in the shoes of a hypothetical willing buyer and seller as of the taking date and determine the price that would have been paid for the property. The severance damage inquiry asks the fact finder to speculate about how a piece of property would be damaged by the taking; if evidence is available that shows exactly how a piece of property was damaged by a taking, that evidence should be considered by the fact finder as it answers the very question that she is tasked with determining. However, when the issue is the value of the property being taken, the inquiry asks the fact finder to determine the value of the property on a specific day, a day that is usually many years earlier than the trial date. Unlike the severance damage inquiry, it is not forward-looking in the same way; instead it asks the fact finders to place themselves in the position of

---

[28] *United States v. 101.88 Acres of Land*, 616 F.2d 762, 767 (5th Cir. 1980).

market participants on the date of value. If they are allowed to consider evidence about markets from years after the taking day, there is always the risk that they may stray from the proper inquiry and instead of determining value as of the taking date, they may end up using a favorable future market to overvalue the property as of the taking date or, alternatively, they may end up using a poor future market to undervalue the property as of the taking date. These important differences between the severance damage inquiry and the "value of the part taken" inquiry lead this Court to find that the severance damage opinions cited by the Government are unhelpful in resolving the present dispute.

Additionally, the Government places heavy reliance on the Third Circuit case *Hickey v. United States*.[29] The Court finds this case distinguishable from the present case for the reasons given by the Defendants in their Reply Brief.[30]

Although the Court rules in favor of the Defendants, this Ruling is premised on the notion that it would be unfair for either side to look to favorable or unfavorable future natural gas storage markets to cull value.[31] Had the natural gas storage market done exceedingly well, much better than the Government's experts had expected, this Court would exclude the evidence for use by the Defendants for all of the Rule 403 reasons discussed above.

Although this Ruling makes it more difficult for the Government to make their case that the natural gas storage market was in decline as of the taking date, the Government has a vast amount of pre-taking information which allows them to make the same points without running into

---

[29] 208 F.2d 269 (3d. Cir. 1954).
[30] Defs.' Reply Br. 7-8, Doc. 383.
[31] *See United States v. 161.99 Acres of Land*, 512 F.2d 65 (5th Cir. 1975) (noting that landowners could not take advantage of a dynamic increase in property value that occurred after the date of the taking because the valuation date is the day the land was taken). Just as the landowners could not get the benefit of the well-performing Texas real estate market between the date of the taking and the date of trial in *161.99 Acres of Land*, this Court will not allow the Government to get the benefit of the downturn in the oil and gas market between the date of the taking and the date of trial. Admitting the post-taking evidence would have the effect of giving the Government the benefit of this downturn.

the issues of confusion that are raised by the post-taking evidence. The Government can rely on information and Defendants' actions before the date of the taking that demonstrate the absence of any demand for the hypothetical additional gas storage capacity from Cavern 102.[32]

### IV.   CONCLUSION

For the reasons stated above, the Court **GRANTS** Defendants' Motion to Exclude Certain Prejudicial Post Date of Taking Evidence (Doc. 366). Accordingly, the Government is precluded from introducing at trial any evidence concerning the gas market, the gas storage market, and the Tenant Defendants' operations and business decisions that a willing buyer and willing seller would not and could not consider on the date of the taking. The Court notes that this Ruling does not affect the Government's ability to introduce evidence regarding market forecasts, Defendants' actions, or future planning made on or before the taking date that demonstrate that the natural gas and natural gas storage markets were in decline.

Signed in Baton Rouge, Louisiana, on April 3, 2017.


_____
**JUDGE JAMES J. BRADY**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

---

[32] *See* Pl.'s Opp. 7, Doc. 378 (discussing all of the pre-taking information that the Government intends to rely on to show that Defendants' forecasts were incredibly speculative).