UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| UNITED STATES OF AMERICA | CIVIL ACTION |
| VERSUS | |
| 9.345 ACRES OF LAND, MORE OR LESS, SITUATED IN IBERVILLE PARISH, STATE OF LOUISIANA, AND SIDNEY VINCENT ARBOUR, III, ET AL. | NO. 11-00803-JWD-EWD |

## RULING

This matter is before the Court on two Motions in Limine seeking to exclude evidence on competing, but related, theories of condemnation blight and project influence/scope of the project rule. Oral argument was held on March 23, 2018. The Court's jurisdiction exists pursuant to 28 U.S.C. § 1358.

The first Motion is a *Motion in Limine to Exclude Evidence Resulting from Condemnation Blight* brought by A. Wilbert's Sons LLC, members of the Wilbert Mineral Group, the Adams Royalty Group, and Boardwalk Louisiana Midstream, LLC f/k/a PL Midstream, LLC ("PLM") ("Defendants") (Doc. 460). The Government filed an Opposition (Doc. 495), and there is no Reply.

The second Motion is the Government's *Motion in Limine to Exclude All Reference to Government or Project Influence and to Preclude Scope of the Project Objections* (Doc. 466). Defendants filed an Opposition (Doc. 499), and there is no Reply.

For the reasons stated herein, Defendants' *Motion in Limine to Exclude Evidence Resulting from Condemnation Blight* (Doc. 460) is **DENIED**; and the Government's *Motion in Limine to Exclude All Reference to Government or Project Influence and to Preclude*

*Scope of the Project Objections* (Doc. 466) is **GRANTED IN PART AND DENIED IN PART**.

I. **BACKGROUND**

The Department of Energy owns and controls several caverns in the Bayou Choctaw Salt Dome as part of the Strategic Petroleum Reserve ("SPR"). The SPR maintains crude oil reserves for natural emergencies and security. The United States acquired Cavern 102 in the Bayou Choctaw Salt Dome on November 30, 2011. The Government condemned Cavern 102 in order to mitigate the loss of Salt Dome Cavern 20, which the Department of Energy had determined presented a significant risk of failure and environmental harm if it remained in operation.

The United States first notified Defendants of its intent to acquire Cavern 102 in November 2009.[1] Shortly thereafter, Allen Kirkley ("Kirkley"), then-President and CEO of PLM, traveled to Washington D.C. to meet with then-Undersecretary of Energy David Johnson to discuss the taking in further detail.[2] Kirkley testified that the purpose of his meeting was to urge the United States to abandon its plans to condemn Cavern 102, but his request was unambiguously denied.[3] Kirkley further testified that, although no specific timeline was discussed, he was told at the meeting that the condemnation process was imminent.[4]

In a takings case, the just compensation determination must be based on the market as it existed at the date of the taking.[5] The Fifth Amendment requires that a

---

[1] Doc. 460-3 at 4.
[2] *Id.*
[3] *Id.*
[4] *Id.*
[5] *United States v. 320.0 Acres of Land*, 605 F.2d 762, 781 (5th Cir. 1979) (citing *United States v. Miller*, 317 U.S. 369, 374, 63 S. Ct. 276, 87 L. Ed. 336 (1943)).

2

landowner whose land has been taken under eminent domain must be compensated for the highest and best use of his land (even if it is a hypothetical use and not the way the land was being used on the date of the taking).[6] Even when considering a non-existent, future highest and best-use, a proper market valuation only considers what a reasonable buyer/seller would have considered on the date of the taking.[7]

Cavern 102 now stores crude oil as part of the SPR. Prior to the taking, Cavern 102 stored liquid ethane. However, both of Defendants' experts concluded that the highest and best use of Cavern 102 at the date of the taking was for natural gas storage.

## II. Motion in Limine to Exclude Evidence Resulting from Condemnation Blight (Doc. 460).

Defendants move to exclude all evidence relating to the value of Cavern 102 as impacted by the United States' November 2009 notification of the impending condemnation. Specifically, Defendants seek to preclude the Government from offering evidence related to how quickly Cavern 102 could be converted into natural gas storage service and/or Defendants' inaction in marketing or preparing to permit Cavern 102 for use as a natural gas storage cavern.

The Government opposes this Motion, arguing the following: (i) condemnation blight is a state law doctrine that is inapplicable to federal eminent domain actions because the doctrine is subsumed by the scope of the project rule; (ii) the scope of the project rule is inapplicable to the facts in this case because Defendants have not met their burden of showing that the pre-condemnation notification impacted the market value of

---

[6] *Id.*
[7] *United States v. Toronto, Hamilton & Buffalo Navigation Co.*, 338 U.S. 396, 406, 70 S. Ct. 217, 223, 94 L. Ed. 195 (1949).

the land; and (iii) Defendants' decision to abandon its plans to convert Cavern 102 was based primarily on factors unrelated to the pre-condemnation notification.

### A.	Standard

Rule 71.1 of the Federal Rules of Civil Procedure governs federal eminent domain actions. The Supreme Court has held that Rule 71.1 provides, in relevant part, that "except for the single issue of just compensation, the trial judge is to decide all issues, legal and factual, that may be presented."[8]

Under Federal Rule of Evidence 401, "evidence is relevant if (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."[9] "Relevant evidence is admissible unless any of the following provide otherwise: the United States Constitution; a federal statute; [the Federal Rules of Evidence]; or other rules prescribed by the Supreme Court."[10] "Irrelevant evidence is not admissible."[11] In takings cases, the Supreme Court has held that evidence that is not probative of fair market value on the date of taking is not relevant, and thus not admissible.[12] The Supreme Court also explained that evidence offered must have a bearing upon what a willing buyer would pay a willing seller for the property on the date of the taking, and the high court held that "considerations that may not reasonably be held to affect market value are excluded."[13]

Under Rule 403, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice,

---

[8] *United States v. Reynolds*, 397 U.S. 14, 19, 90 S. Ct. 803, 25 L. Ed. 2d 12 (1970).
[9] Fed. R. Evid. 401.
[10] Fed. R. Evid. 402.
[11] *Id.*
[12] *Olson v. United States*, 292 U.S. 246, 54 S. Ct. 704, 78 L. Ed. 1236 (1934).
[13] *Id.* at 256.

confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."[14] "'Unfair prejudice' within this context means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one."[15] "In reaching a decision whether to exclude on grounds of unfair prejudice, consideration should be given to the probable effectiveness or lack of effectiveness of a limiting instruction."[16]

It is well established that relevant evidence may still be excluded by a trial court if it fails to pass Rule 403 muster.[17] "A trial court's ruling on admissibility under Rule 403's balancing test will not be overturned on appeal absent a clear abuse of discretion."[18]

### B. Parties' Arguments

The doctrine of "condemnation blight" considers the depreciatory effects of an announced condemnation before the formal date of taking. Defendants assert that the doctrine mandates the exclusion of evidence indicating any depreciation in value of Cavern 102.[19] Defendants contend that the Government's November 2009 pre-condemnation notice resulted in depreciation of the condemned asset; according to Defendants, they were forced to abandon their pursuit and marketing of converting Cavern 102 for natural gas storage at that time because of the Government's notice.[20]

Defendants argue that, under the doctrine of condemnation blight, the effects of such a notification should not be considered in the valuation of the condemned property.[21]

---

[14] Fed. R. Evid. 403.
[15] *Id.*, 1972 Advisory Committee Note.
[16] *Id.*
[17] *Wellogix, Inc. v. Accenture, L.L.P.*, 716 F. 3d 867, 882 (5th Cir. 2013) (citation omitted).
[18] *Id.* (quoting *Ballou v. Henri Studios, Inc.*, 656 F.2d 1147, 1153 (5th Cir. 1981) (internal quotations omitted)).
[19] Doc. 460-1 at 1.
[20] *Id.* at 3.
[21] *Id.*

5

Defendants assert that the proper valuation analysis must consider Defendants' actions and the fair market value as to Cavern 102 as if the fall 2009 announcement was never made.[22] While Defendants do not seek to change the actual date of valuation, they urge the Court to fashion a remedy to ensure that the effects of the pre-condemnation notification "are not considered in a just compensation analysis, not only by excluding evidence of the negative impact, but also by perhaps a jury instruction."[23]

Defendants' cite to three federal cases and three state law cases in support of their condemnation blight argument. First, the Defendants cite to the Supreme Court case of *United States v. Virginia Electric and Power Company*.[24] According to Defendants, this case held that "a more realistic valuation of condemned property as of the date of taking is achieved by excluding the fact of condemnation itself from the compensation calculus."[25] Next, Defendants cite to *United States v. 320.0 Acres of Land*,[26] arguing that, there, the Fifth Circuit noted that "'market value' of property condemned can be affected, adversely or favorably, by the imminence of the very public project that makes the condemnation necessary."[27] Finally, Defendants cite to *United States v. 10.082 Acres of Land,*[28] asserting that in that case, the federal trial court (a) refused to exclude evidence of a decline in property value of a condemned asset on the basis of condemnation blight, and (b) found that, in order to be made whole, "the dispossessed landowners must

---

[22] *Id.* at 4.
[23] *Id.*
[24] *Va. Elec. Power Co.*, 365 U.S. 624 (1961).
[25] Doc. 460-1 at 5 (quoting *Va. Elec. Power Co.*, 365 U.S. at 636).
[26] *320.0 Acres*, 605 F.2d 762 (5th Cir. 1979).
[27] *Id.* at 786 (quoting *United States v. Reynolds*, 397 U.S. 14, 16 (1970), 90 S.Ct. 803, 25 L.Ed.2d 12).
[28] *10.082 Acres*, No. 05-363, 2007 WL 962846, at *10-11 (D. Ariz. Mar. 27, 2017).

logically be compensated for the decline in property value that they prove to be caused solely by the taking."[29]

Defendants also cite to the following three state law cases: (1) *City of Buffalo v. J.W. Clement Co.*[30] (holding that, when condemnation blight reduces the value of the later condemned property, "compensation shall be based on the value of the property at the time of taking, as if it had not been subjected to the debilitating effect of a threatened condemnation"); (2) *In re City of New York*[31] (holding that, although generally, property is to be valued at the time of taking, to eliminate the distorting effect of the project, courts have sometimes admitted evidence of value at the time the project was first announced); and (3) *Baston v. County of Kenton County Airport Board*[32] (holding that "there may be other ways to remove the market's knowledge of the project, and trial courts are free to employ them as appropriate.").

The Government opposes the Motion. The Government argues that this is a *de jure* taking of private property for public use, so the doctrine of condemnation blight is subsumed within the scope of the project rule.[33] The Government further contends that, as a practical matter, a federal claim of blight can only be made in a *de facto* or an inverse takings claim.[34] Additionally, the Government asserts that the federal scope of the project rule can only be applied when Defendants meet their burden of producing evidence indicating an impact upon the market resulting from the announcement of the project.[35] According to the Government, Defendants have not shown here that the pre-

---

[29] *Id.* at 11.
[30] Doc. 460-1 at 4 (citing *City of Buffalo*, 28 N.Y.2d 241, 255, 269 N.E.2d 895, 903 (1971)).
[31] Doc. 460-1 at 5 (citing *In re City of New York*, 25 Misc.3d 288, 887 N.Y.S.2d 776 (Sup. Ct. 2009)).
[32] *Id.* (citing *Baston*, 319 S.W.3d 401, 408 (Ky. 2010)).
[33] Doc. 495 at 4-5.
[34] *Id.* at 5.
[35] *Id* at 3-4.

7

condemnation notification affected the market value of Cavern 102, and therefore the scope of the project rule cannot be applied.[36] Finally, the Government argues that state law measures enacted to safeguard against condemnation blight (as is applied in the state law cases cited by Defendants) are inapplicable to federal condemnation actions.[37]

### C.     Discussion

The Court agrees with the Government that the doctrine of condemnation blight is inapplicable to the instant federal action. Both federal and state courts have examined the issue of whether condemnation blight—i.e. the impact of certain actions by the condemning authority upon the value of the subject property prior to the taking—can be taken into consideration when determining the value of a condemned property. State court rulings are mixed on this issue. In some states, claims of "condemnation blight" are sometimes equated with *de facto* takings.[38] In these jurisdictions, a court may disregard any decreases in market value caused by the condemning authority's pre-condemnation activity by designating an alternative date of taking for the computation of damages.[39] Other jurisdictions decline to make such a comparison and do not permit compensation for a decline in market value due to the condemning authority's pre-condemnation activites.[40]

---

[36] *Id.*
[37] *Id.*
[38] 4 Nichols, The Law of Eminent Domain, s 12B.17(6). ("*De facto*" takings have traditionally been limited to factual patterns in which the condemnor physically invaded or otherwise interfered with the condemnee's possession and enjoyment or his or her property).
[39] *See City of Buffalo v. J.W. Clement Company*, 269 N.E.2d 895, 901 (N.Y. 1971) (holding that a *de facto* taking had occurred at a date earlier than the actual date of taking because the ten-year long protracted delay between the announcement of the taking and the actual date of the taking had significantly destroyed the value of the defendant's property).
[40] *See State v. Vaughan*, 319 S.W.2d 349, 354 (Tex. Civ. App.—Austin 1958, no writ) (holding that the landowners loss of rental income from tenants who vacated building after the government's pre-condemnation announcement was not compensable because "there had been neither a taking or any character of a physical invasion of the property. Indeed, the condemnation may be completely abandoned and the property never taken.").

Federal courts take a different track. In *de facto* takings cases, federal courts do consider incidental and consequential damages, as well as the property's undepreciated value, and, in *de facto* cases, the court can exclude depreciation that occurred because of blight. But this is not a *de facto* takings case.[41] It is a *de jure* takings case. Federal jurisprudence establishes that, in *de jure* takings cases, courts do not consider condemnation blight (e.g. losses based on the pre-condemnation activity of the condemning authority).[42]

One often-cited example is the Supreme Court's holding in *Danforth v. United States*.[43] Danforth involved the taking of a flowage easement as part of the federal Flood

---

[41] Nor are Defendants seeking to change the valuation date to the earlier date of the pre-condemnation announcement (November 2009), as would be common in a de facto takings claim. *See* 4 Nichols, The Law of Eminent Domain, s 12B.17(6) ("Ordinarily, a de facto taking requires: (i) a physical entry by the condemnor; (ii) a physical ouster of the owner, (iii) a legal interference with the physical use, possession, or enjoyment of the property, or (iv) a legal interference with the owner's power of disposition of property…For a property owner to establish a de facto taking, he or she must show that there are exceptional circumstances that substantially deprive the owner of the use of his or her property, and further, that his or her deprivation is the direct and necessary consequence of the actions of the entity exercising its power of eminent domain…In all cases where a de facto taking of property is alleged, the claimant has a heavy burden of proof and that proof must include a showing that the deprivation complained of is the direct and necessary consequence of governmental action in question.").

[42] *See United States v. General Motors Corp.*, 323 U.S. 373, 379, 65 S. Ct. 357, 89 L. Ed. 311 (1945) (holding "The sovereign ordinarily takes the fee. The rule in such a case is that compensation for that interest does not include future loss of profits, the expense of moving removable fixtures and personal property from the premises, the loss of good-will which inheres in the location of the land, or other like consequential losses which would ensure the sale of the property to someone other than the sovereign. No doubt all these elements would be considered by an owner in determining whether, and at what price, to sell. No doubt, therefore, if the owner is to be made whole for the loss consequent on the sovereign's seizure of his property, these elements should properly be considered. But the courts have generally held that they are not to be reckoned as part of the compensation for the fee taken by the Government."); *see also* 4 Nichols, The Law of Eminent Domain, s 12B.17(6) (*quoting Monongahela Navigation Co. v. United States*, 148 U.S. 312, 13 S. Ct. 622, 37 L. Ed. 463 (1983)) ("The primary basis for the rejection of incidental damages on the ground that the right to sue for such injuries is not 'property' in a constitutional sense was first enunciated in *Monongahela* case, in which the Supreme Court expressed the underlying rationale as follows: 'And this compensation, it will be noticed, is for the property and not the owner. Every other clause in the Fifth Amendment is personal. "No person shall be held to answer for a capital, or otherwise infamous crime," etc. Instead of continuing that form of statement, and saying that no person shall be deprived of his property without just compensation, the personal element is left out, and the "just compensation" is to be a full equivalent of the property taken.' The *Monongahela* rationale set the pattern in this country for the law of compensation in eminent domain. It must be noted, however, that the *Monongahela* reasoning does not apply to all State constitutions, many of which provide, unlike the Federal Constitution, that no 'person' shall be denied just compensation.").

[43] *Danforth*, 308 U.S. 271, 650 S. Ct. 231, 84 L. Ed. 240 (1939).

Control Act of 1928.[44] The landowner sought compensation from the date Congress enacted legislation authorizing the taking as opposed to the date when the government actually took possession of the property.[45] In rejecting the landowner's argument, the Court held:

> A reduction or increase in the value of the property may occur by reason of legislation for or the beginning or completion of a project. Such changes in value are incidents of ownership. They cannot be considered as a 'taking' in the constitutional sense.[46]

Similarly, *Hempstead Warehouse Corp. v. United States*,[47] involved the government's planned expansion of an airfield.[48] The expansion incorporated the landowner's property and was widely publicized.[49] The landowner claimed that the publicity of the plan prevented him from selling the property, and he was therefore entitled to the rental value of the land.[50] The federal claims court rejected the landowner's argument and held: "It is obvious that there is more than one weakness in [landowner's] position, but it suffices to say that a threat of condemnation is not a taking, as the [landowner] professes."[51]

Additionally, in all of the cases cited by Defendants in which courts have applied the doctrine of condemnation blight, they have done so only after finding that the

---

[44] Id. at 280.
[45] *Id.* at 283.
[46] *Id.* at 285.
[47] *Hempstead Warehouse Corp.*, 98 F.Supp. 572 (Ct. Cl. 1951).
[48] *Id.* at 573.
[49] *Id.*
[50] *Id.*
[51] *Id. See also 120 Delaware Ave., L.L.C. v. United States*, 95 Fed. Cl. 627 (Fed. Cl. 2010) (refusing to dismiss landowner's inverse taking claim alleging government's pre-condemnation actions caused landowner's tenants to relocate and deprived it of rental income); *Barsky v. Wimington*, 578 F.Supp. 170, 173-74 (D.Del. 1983) (dismissing landowner's claim for compensation due to an announced urban renewal project's effects and noting that the condemnation blight principles are incorporated into the takings analysis).

defendants put forward evidence of the market value being impacted by the condemning authority's pre-condemnation activities.

This is exemplified in *10.082 Acres of Land*, which is the only federal case cited by Defendants in which the trial court directly addresses the doctrine of condemnation blight.[52] There, the actual taking occurred over six years after the pre-condemnation announcement.[53] The trial court refused to exclude evidence that the government's pre-condemnation announcement decreased the value of the land.[54] But the court did so only after the defendant produced market evidence demonstrating that potential buyers were diverted to areas other than the subject neighborhoods.[55] Further, the court merely stated that "the doctrine of condemnation blight [was] *potentially* applicable."[56]

*10.082 Acres* is distinguishable in a number of ways. First, unlike the *10.082* landowners, here the Defendants failed to offer any evidence that the market value of Cavern 102 was impacted by the announcement. In fact, Defendants' counsel stipulated that there was no general impact on the market value resulting from the project.[57]

Second *10.082 Acres* is distinguishable with respect to the landowners' actions. In *10.082 Acres*, the defendant landowners made several significant improvements to their land after pre-condemnation notification was received. These included removing all citrus trees from all five parcels of land; constructing a workshop, an office, and a manufactured home on the subject land; and installing an oversized septic system to

---

[52] *10.082 Acres of Land*, 2007 WL 962846, at 10-11.
[53] *Id.* at 2.
[54] *Id.* at 10-11.
[55] *Id.*
[56] *Id.* (emphasis added). The court rejected the plaintiff's argument that any fluctuation in market value caused by the announcement of the project itself was simply an incident of property ownership and not compensable in a federal condemnation proceeding.
[57] Doc. 495-1 at 5-6.

service the improvements on the subject land.[58]  By contrast, here, Defendants made no similar improvements to the condemned property, and even they assert that the pre-condemnation notification prompted them to place any such plans for the subject property on hold.  Thus, for these two reasons, *10.082 Acres* does not support the Defendants' position.

Further, contrary to Defendant's assertions, the Fifth Circuit case of *320.0 Acres* does not justify the application of the doctrine of condemnation blight.  The term condemnation blight is found only in a footnote explaining that "compensation problems that are raised by depreciation in value attributable to governmental activities are frequently analyzed in terms of condemnation blight or de facto takings, rather than under the scope of the project rule."[59]  However, the vast majority of the court's analysis is related to the applicability of the scope of the project rule, which, if triggered, excludes evidence of depreciation as well as appreciation of the condemned property attributable to the government's project in ascertaining fair market value and just compensation.[60]

For all of these reasons, the Court finds that the doctrine of condemnation blight is inapplicable to the facts of this case and therefore irrelevant to determining just compensation.

The Court also finds that the scope of the project rule is inapplicable to this case.  The Fifth Circuit explained in *320.0 Acres*, "[t]he scope of the project rule refines the concept of fair market value only with respect to alterations in value attributable to [the specific government project at issue].  It has no bearing whatsoever upon alterations in

---

[58] *10.082 Acres of Land*, 2007 WL 962846, at 2.
[59] *320.0 Acres*, 605 F.2d 762, at fn. 32 (*citing* 4 Nichols, The Law of Eminent Domain, s. 12B.17(6)).
[60] *Id*. at 806.

value attributable to other events or market forces."[61] Because the parties are in agreement that there was no impact to the general market value of the condemned property as a result of the 2009 pre-condemnation announcement, and because Defendants have not produced evidence to the contrary, the Court finds the scope of the project rule is inapplicable to the instant case.

Lastly, the Court finds the evidence Defendants seek to exclude is admissible under Fed. R. Evid. 401 and 403. The evidence is relevant and probative of the issue of the value of the condemned property at the time of the taking. Further, the Court finds the evidence is not unduly prejudicial or otherwise barred under Rule 403.

Accordingly, for all these reasons, the Defendants' *Motion in Limine to Exclude Evidence Resulting from Condemnation Blight* (Doc. 460) is **DENIED**.

### III. Motion in Limine to Exclude All Reference to Government or Project Influence and to Preclude Scope of the Project Objections (Doc. 466).

The Government moves this Court to exclude all reference to government or project influence and to preclude Defendants from objecting at trial on project influence/scope of the project grounds. Defendants oppose this Motion. According to Defendants, the Government will claim that Defendants failed to pursue their preliminary plans for the conversion of Cavern 102 to natural gas storage after the pre-condemnation notice was issued and for reasons unrelated to the taking.[62] Defendants say they must defend themselves from this anticipated argument.[63]

---

[61] *Id.* at 803.
[62] Doc. 499 at 2.
[63] *Id.*

### A. Standard

The Court examines the Government's Motion (Doc. 466) using the same standard as previously stated in addressing the Defendants' Motion (*see* Section II, Subsection A, *supra*.).

### B. Parties' Arguments

The Government argues that Defendants have misapplied the scope of the project rule and are attempting to value Cavern 102 based on "counterfactual assumptions" that are unrelated to any supposed market impact caused by the Government's project.[64] The Government further asserts that while Defendants are free to argue that the highest and best use for Cavern 102 is something different than its existing use on the date of taking, they cannot "assume away the risks associated with effectuating this hypothetical use, including risks of not obtaining permitting and not obtaining customer contracts."[65] The Government also maintains all of its arguments cited in its Opposition to Defendants Motion (Doc. 460) (*see* Section II, subsection B, *supra*.), including its argument that as long as the market data used to value the property is not tainted by the government project, there can be no project influence on the value of the taken property.[66]

The Government cites to *United States v. 1.604 Acres of Land*[67] in support of its arguments. In that case, the court held that the "landowner must present sufficient evidence that the government's project had a market impact on the subject property" in order to trigger the scope of the project rule.[68] The Government also relies on the Fifth Circuit's holding in *320.0 Acres* that the scope of the project rule "refines the concept of

---

[64] Doc. 466-1 at 1.
[65] *Id.* at 2.
[66] *Id.* at 12.
[67] *1.604 Acres*, 844 F.Supp. 2d 668 (E.D. Va. 2011).
[68] *Id.* at 675.

14

fair market value only with respect to alterations in value attributable to [the specific government project at issue]. It has no bearing whatsoever upon alterations in value attributable to other events or market forces."[69]

The Government also relies heavily upon the Supreme Court's decision in *Kirby Forest Industries, Inc. v. United States*.[70] The Government contends that, in *Kirby*, the government filed a condemnation case in which it did not take immediate title to the land.[71] The defendant landowner argued that the filing of the complaint and notice of *lis pendens* had the effect of preventing it from making profitable use of the land, or selling it, which constituted a taking.[72] The Court disagreed, finding that "until title passed to the United States, [the landowner] was free to make whatever use it pleased of its property."[73] Because the landowner failed to demonstrate that his interests in the land were impaired in any significant way by the government, the Court ruled that the property had to be valued at the date that compensation was paid and title passed to the United States, not some earlier date.[74]

The Government argues that, like the landowner in *Kirby*, Defendants had every right and opportunity to develop Cavern 102 prior to the date of taking, as well as to receive compensation for any increase in market value resulting from such development.[75] The Government further contends that Defendants should not be allowed to assume unchallenged that all legal permits would have been granted by the Date of Taking, or that Defendants would have had contracts in place for Cavern 102 by the Date

---

[69] *320.0 Acres*, 605 F.2d 762, at 803.
[70] *Kirby*, 467 U.S. 1 (1984).
[71] *Id.* at 7-8.
[72] *Id.* at 13.
[73] *Id.* at 15.
[74] *Id.* at 16.
[75] Doc. 466-1 at 14.

15

of Taking.[76] Additionally, the Government asserts that allowing Defendants to object to legitimate cross-examination and evidence will impermissibly shield Defendants' experts against a claim that they failed to consider the risks of converting Cavern 102 in their valuations.[77]

Defendants oppose the Motion, arguing that the Government's reading of the scope of the project rule is too narrow and does not serve the equitable purposes for which the doctrine was enacted.[78] Defendants further assert that ignoring the effects of the 2009 pre-condemnation announcement on Defendants' plans to convert Cavern 102 to natural gas storage creates a "counterfactual reality".[79] Defendants argue that they need to be able (a) to show the significant impact that the Government's pre-condemnation announcement had on their plans for Cavern 102, and (b) to defend against the Government's attacks on the likelihood of storing natural gas in Cavern 102 and the timing thereof.[80] Finally, Defendants argue that the Government presents a "parade of horribles" about condemnation blight principles being applied in this case and that such concerns are unwarranted and overstated.[81]

### C. Discussion

The doctrine of project influence generally encompasses any increase or decrease in value that is directly attributable to the affect the public project had on the market value of the condemned property.[82] But the scope of the project rule is a narrowed version of

---

[76] *Id.* at 15.
[77] *Id.*
[78] Doc. 499-1 at 1.
[79] *Id.* at 2.
[80] *Id.*
[81] *Id.* at 3.
[82] *U.S. v. 1.604 Acres of Land, More or Less, Situated in City of Norfolk, Va.*, 844 F. Supp. 2d 668, 673-74 (E.D. Va. 2011).

16

this doctrine.[83]  The rule was articulated by the United States Supreme Court in *United States v. Miller.*[84]  The Court held:

> The question then is whether the respondents' lands were probably within the scope of the project from the time the Government was committed to it.  If they were not, but were merely adjacent lands, the subsequent enlargement of the project to include them ought not to deprive the respondents of the value added in the meantime by the proximity of the improvement.  If, on the other hand, they were, the Government ought not to pay any increase in value arising from the known fact that the lands would be condemned.  The owners ought not to gain by speculating on probable increase in value due to the Government's activities.[85]

Subsequently, in *United States v. Reynolds*,[86] the Court affirmed the rule and even expanded its scope to include compensation for depreciation.  The Court held: "to permit compensation to be either reduced or increased because of an alteration in market value attributable to the project itself would not lead to the 'just compensation' that the Constitution requires."[87]  To apply the scope of the project rule, the trial court must not only find that the subsequent taking was within the scope of the original project, but also that the market value was affected (either positively or negatively) by the project itself.[88]

The Court has already held that the scope of the project rule is inapplicable to the instant case because Defendants have failed to demonstrate a change in the market value of Cavern 102 due to the pre-condemnation announcement.  The Court similarly holds that objections made by Defendants at trial based on "project influence" would be improper, as the record does not contain evidence that the market was affected by the pre-condemnation announcement.

---

[83] *Id.*
[84] *Miller*, 317 U.S. 369 at 377.
[85] *Id.*
[86] *Reynolds*, 397 U.S. 14 at 16-17.
[87] *Id.*
[88] *United States v. Virginia Elec. & Power Co.*, 365 U.S. 627, 635-36, 81 S.Ct. 784, 5 L.Ed.2d 838 (1961).

For this reason, the Court **GRANTS** the Government's Motion in that Defendants are precluded from objecting on project influence or scope of the project grounds to certain evidence or argument from the Government. This specifically includes evidence or argument (i) about the risks of converting Cavern 102 from its existing use of ethane storage to the hypothetical use of natural gas storage, or (ii) concerning Defendants' experts' failure to consider such risks.

However, the Court will not prevent Defendants from introducing evidence indicating that the announcement impacted their earlier plans to convert Cavern 102. The Court finds that such evidence is relevant to Defendants' contention regarding the highest and best use of the condemned property, and its probative value significantly outweighs and danger of unfair prejudice to the Government. Indeed, the Government even concedes the admissibility of this evidence.[89] Accordingly, the Court **DENIES** the Government's Motion only as it relates to evidence that Defendants changed or altered their plans for Cavern 102 as a result of the Government's pre-condemnation announcement in 2009.

---

[89] Hearing Transcript, March 24, 2018, Doc. 533 at 252: 18-21.

**IV. CONCLUSION**

For the foregoing reasons, Defendants' *Motion in Limine to Exclude Evidence Resulting from Condemnation Blight* [90] is **DENIED**, and the Government's *Motion in Limine to Exclude All Reference to Government or Project Influence and to Preclude Scope of the Project Objections*[91] is **GRANTED IN PART AND DENIED IN PART**.

IT IS SO ORDERED.

Signed in Baton Rouge, Louisiana, on April 24, 2018.

**JUDGE JOHN W. deGRAVELLES
UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA**

---

[90] Doc. 460.
[91] Doc. 466.